# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | |
|---|---|
| STEVEN J. ROBBINS, | ) |
| Petitioner, | ) |
| | ) |
| v. | ) CAUSE NO. 3:09-CV-0280 WL |
| | ) |
| SUPERINTENDENT, INDIANA STATE PRISON, | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

Petitioner Steven Robbins filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2002 Vanderburgh County conviction for murder, for which he received a sentence of ninety-five years. The Indiana Court of Appeals affirmed Robbins's conviction on direct appeal, and the Indiana Supreme Court declined to accept his petition to transfer. Robbins filed a petition for post-conviction relief, which the trial court denied. The Indiana Court of Appeals affirmed the trial court's denial of post-conviction relief, and the Indiana Supreme Court denied transfer.

In reviewing a petition for federal collateral relief from a state court judgment of conviction, this court must presume as correct the facts as found by the state courts. 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 449 U.S. 539, 547 (1981). A habeas petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). As stated by the Indiana Court of Appeals in Robbins's direct appeal, the facts related to his conviction are as follows:

Robbins moved from Gary to Evansville to sell cocaine. Shortly thereafter, he

met Brenda Douglas, who sold cocaine for him. Robbins and Douglas soon became involved in a personal relationship. Jerry Preshon also sold drugs for Robbins. Preshon frequently warned Robbins that Douglas was a "snitch." Robbins initially ignored Preshon's warning, but he began to take them more seriously when he realized that Douglas was stealing money from him.

In August 2001, Robbins told Preshon that he was going to "pop" Douglas. Preshon understood this to mean that Robbins intended to kill Douglas. Early that month, Robbins, Douglas, and Preshon planned a trip to Chicago to pick up a large quantity of drugs. Robbins told Preshon that he was going to shoot Douglas during the trip and dump her body. However, on the way to Chicago, Douglas was pulled over for an infraction in Sullivan County and arrested on an outstanding warrant. Robbins was therefore unable to complete his plan.

By the end of November 2001, Robbins and Douglas had severed their personal and professional relationships. Douglas had moved out of the Evansville apartment that she had shared with Robbins and in with her parents. She told a friend, Raymond Goodwin, that she was scared of Robbins. When Preshon saw Douglas one day and asked her where Robbins was, she responded as follows: "I don't mess with him no more, you know. I done got him for about $6,000.00, you know what I'm saying? He's smoking.

On Friday, November 30, 2001, Robbins sold cocaine at Kevin Carter's apartment. Robbins told Carter that he was mad at Douglas because she was "messing up his drug business." That same day, Robbins called Douglas from Janette King's house. When King mentioned the call to Douglas later that day, Douglas said she was "tired of putting up with that motherf-----' s stuff," and that he would not leave her alone. King knew that Douglas sold cocaine for Robbins. She had seen Douglas with black eyes and marks on her neck on several occasions and knew that Robbins beat Douglas over discrepancies with money. Also that day, Erica Ingram purchased cocaine from Robbins. She noticed that Robbins was wearing a blue jump suit.

The following day, December 1, 2001, Douglas attended an Indiana University football game with family members, including her father, James Owsley. Owsley knew that Douglas was afraid of Robbins, and Owsley was afraid for Douglas to be with Robbins because Robbins had previously busted Douglas' lip and broken her tooth.

While Douglas was at the football game, Robbins was selling cocaine. When Robbins was at Raymond Goodwin's house, Goodwin noticed the impression of a handgun under Robbins' shirt. That same day and evening, Velma Merriweather twice noticed Robbins in the vicinity of the Coon Dog Liquor Store ("the liquor store"). She also noticed that Robbins was wearing blue coveralls. Preshon also saw Robbins and mentioned that he thought Robbins was leaving town and returning to Gary. Robbins responded that he had something to do first. Preshon understood that to mean that Robbins planned to kill Douglas before he left town with his common-law wife, Joy Kortum.

When Douglas returned home from the football game, her brother took her to a house in the vicinity of the liquor store. At approximately 9:15 p.m., Douglas saw Nancy Weekly and Vance Archer and walked to the liquor store with them. Weekly mentioned that she had seen Robbins that morning, and Douglas responded that she did not associate with Robbins because he was crazy. Weekly, Archer, and Douglas walked from the liquor store to Weekly's apartment. After finishing her drink, Douglas decided to take the city bus home.

A few minutes after Douglas left, at approximately 10:00 p.m., Weekly and Archer heard six gunshots. Shortly thereafter, Kevin Carter knocked at their door and told them that Douglas had been shot. Douglas died as the result of six gunshot wounds. There was no evidence that she was the victim of a robbery. Further, police officers found no weapon. They did, however, find a damaged holster at the scene.

On December 5, 2001, Robbins contacted Evansville Police Department Sergeant Ted Mattingly from Gary. Robbins explained that he had telephoned Douglas that morning of her death. He further explained that Douglas was an informant on a federal drug case and a "manipulator and liar deluxe," who stole from him. Tr. p. 610. Robbins told Sergeant Mattingly that he and Kortum had returned to his Evansville apartment at 9:30 p.m. the night that Douglas was shot. According to Robbins, he and Kortum were at the apartment until late Sunday morning when they left to say goodbye to friends before returning to Gary. Robbins told Sergeant Mattingly that his car was parked in front of the apartment the entire night. Robbins subsequently spoke with Indiana State Police Officers and additional Evansville Police Department Officers. He was charged with Douglas' murder after officers determined that his information was not consistent with the investigative facts.

At trial, several witnesses testified to the previously mentioned facts. In addition, three witnesses who lived in the vicinity of the shooting testified that they heard the gunshots and saw a black man running from the scene. Specifically, Viola Coleman testified that she heard six gunshots, looked outside, and saw a black man wearing a blue jogging suit running down the alley. Nathan Hobgood testified that he saw a black man wearing a blue sweat suit with a hood. When pressed as to whether Robbins was the man that he had seen, Hobgood responded that Robbins fit the description, but he could not say whether Robbins was the man. Lastly, Michelle Williams testified that she saw a black man wearing a dark jacket.

In addition, three witnesses testified that Robbins' car was not parked in front of his Evansville apartment either the Saturday night that Douglas was shot or the following Sunday morning. Specifically, Leonilla Williams, who lived in the same apartment complex, testified that Robbins' car was not parked in front of his apartment that night. Further, Seronica Cartwright, who lived across the hall from Robbins, noticed that Robbins' car was not parked in front of his apartment when she returned home at 9:30 Saturday night of when she looked outside at 11:00 Sunday morning. Lastly, Evansville Police Department Officer Conon Karmire testified that that he went to Robbins' Evansville apartment at 1:45 a.m. on Sunday, December 2, 2002 [sic], knocked loudly on the door several times, and left when no one responded. Further, no witness remembered seeing Robbins and Kortum on the Sunday following Douglas' murder. Finally, Preshon testified that the holster found at the crime scene belonged to Robbins. Preshon had seen it in Robbins' closet when he helped Robbins move into the Evansville apartment. Preshon also testified that he did not receive any benefit from the State in exchange for his testimony. A jury convicted Robbins of murder and adjudicated hi m to be an habitual offender.

(DE 14-5 at 2-6.)

In evaluating a legal determination made by a State court, the:

AEDPA provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts

the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

*Brown v. Payton*, 544 U.S. 133, 141 (2005) (citations omitted).

> For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by this Court refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision. We look for the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.

*Yarborough v. Alvarado*, 541 U.S. 652, 660-661 (2004) (quotation marks and citations omitted).

Furthermore, the United States Supreme Court has made clear that district courts should not independently decide the merits of the petitioner's legal arguments.

> As we have explained, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied a [United States] Supreme Court case incorrectly. Rather it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.

*Price v. Vincent*, 538 U.S. 634, 641 (2003) (quotation marks, citations and brackets omitted).

In his habeas petition, Robbins raises two issues. He asserts (1) that there was insufficient evidence to support the finding of guilt, a claim he presented to the state courts in his direct appeal, and (2) that the State concealed a plea agreement with a witness who testified against Robbins at trial, a claim he presented in post-conviction proceedings.

## SUFFICIENCY OF THE EVIDENCE CLAIM

The Fourteenth Amendment's due process clause prevents a State from convicting a person of a crime without proving the elements of that crime beyond a reasonable doubt.

5

*Fiore v. White*, 531 U.S. 225, 227 (2001) (citing *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); and *In re Winship*, 397 U.S. 358, 364 (1970)).

A federal court evaluating the sufficiency of evidence supporting a conviction must construe that evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *McFowler v. Jaimet*, 349 F.3d 436, 446 (7th Cir. 2003) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The relevant inquiry for a federal habeas court reviewing a sufficiency of evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brumley v. Detella*, 83 F.3d 856, 862 (7th Cir. 1996). A petitioner is only "entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Cabrera v. Hinsley*, 324 F.3d 527, 533 (7th Cir. 2003) (citing *Jackson*, 443 U.S. at 324).

The Indiana Court of Appeals concluded that the evidence showed that: (1) Robbins and Douglas had a personal relationship and sold drugs together and that Douglas told others she had stolen "about $6,000.00" from him and that he "would not leave her alone." (DE 14-5 at 8). Robbins indicated to Preshon that he was going to kill Douglas before he left town. (*Id*. at 8). Robbins was wearing blue coveralls and had a gun tucked in his shirt on the day of the murder (*Id*. at 8), and witnesses who lived in the neighborhood heard shots and saw a man in blue clothing running from the scene. (*Id*. at 8-9). Robbins' holster

6

was found at the scene, and he offered the police a false alibi. (*Id*. at 9). The Indiana Court of Appeals correctly determined that the evidence was sufficient for a rational trier of fact to have found proof of guilt beyond a reasonable doubt based on this evidence, and the state court's determination was not contrary to and did not or involve an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States.

## BRADY CLAIM

In ground two of his petition Robbins asserts that the State committed misconduct by permitting Jerry Preshon to deny any expectation of benefit for his testimony. He presented this argument to the Indiana courts in his petition for post-conviction relief.

A Criminal defendant has a due process right to receive from the prosecution evidence favorable to the defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* violation occurs when the prosecution suppresses material evidence – including exculpatory and impeachment evidence – that is favorable to an accused

> There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.

*Id.* at 281-282.

The state court record establishes that at the time he testified at Robbins's trial, Preshon was facing a charge of being an habitual traffic offender. He testified at trial that he had not reached a plea bargain agreement and that the case was set for trial. (DE 14-10

7

at 6). Sometime after testifying against Robbins, Preshon reached a plea bargain agreement with the state and received a suspended sentence on each charge. (*Id.* at 7).

The Indiana courts found that there was no plea agreement between Preshon and the State at the time of Robbins' trial, and that the jury was fully informed of the status of Preshon's pending criminal cases and any expectations regarding them that he may have harbored at the time he testified. (DE 14-10 at 6-7). This finding is binding on this court in considering Robbins's petition for writ of habeas corpus. 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 449 U.S. at 547 unless petitioner rebuts the presumption by "clear and convincing evidence." § 2254(e)(1). Robbins has not rebutted the evidence that Preshon and the State reached a plea bargain after Robbins's trial and that the jury was fully informed of the status of Preshon's pending criminal cases and any expectations regarding them that he may have harbored . Accordingly, there was no *Brady* violation both because there was no evidence that the State willfully or inadvertently suppressed any favorable evidence.

For the foregoing reasons, the court the court **DENIES** this petition.

SO ORDERED on January 22, 2010

                                               s/William C. Lee
                                               William C. Lee, Judge
                                               United States District Court